UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

JESUS REYNOSO FLORES,

          Petitioner,

   v.

WILLIAM MUNIZ, Warden

          Respondent.

Case No.  1:16-cv-01475-LJO-MJS (HC)

**FINDINGS AND RECOMMENDATION TO DENY PETITION FOR WRIT OF HABEAS CORPUS**

**THIRTY (30) DAY OBJECTION DEADLINE**

     Petitioner is a state prisoner proceeding with a petition for writ of habeas corpus under 28 U.S.C. § 2254. He is represented by Diane Therese Letarte. Respondent William Muniz is represented by Darren Kyle Indermill of the Office of the California Attorney General.

     The petition raises a single issue: whether the trial court erred in failing to suppress Petitioner's confession on the ground it was obtained in violation of Miranda v. Arizona, 384 U.S. 436 (1966).

     For the reasons stated below, the undersigned will recommend that the petition be denied.

## I.     Procedural History

Petitioner is currently in the custody of the California Department of Corrections and Rehabilitation pursuant to the June 21, 2013 judgment of the Superior Court of California, County of Madera for first degree murder, with felony-murder and lying-in-wait special circumstances, and premeditated attempted murder with firearm enhancements. He was sentenced to life without the possibility of parole, with an additional indeterminate term of fifty-two years to life. (Lodged Doc. 4 at 933.) People v. Flores, No. F067554, 2015 WL 3902037, at *1-2 (Cal. Ct. App. June 24, 2015).

Petitioner appealed his conviction and sentence. (Lodged Doc. 26.) On June 24, 2015 the California Court of Appeal for the Fifth Appellate District ordered the trial court to correct the abstract of judgment with respect to presentence custody credit, but otherwise affirmed the judgment. (Lodged Doc. 29.) Flores, 2015 WL 3902037, at *13. On September 29, 2015, the California Supreme Court denied review. (Lodged Doc. 31.)

Petitioner filed the instant federal habeas petition on October 3, 2016. (ECF No. 1.) Respondent filed an answer to the petition on January 4, 2017. (ECD No. 13.) Petitioner filed a traverse on January 12, 2017. (ECF No. 15.). The matter stands ready for adjudication.

## II.     Factual Background[1]

### *Dairy Shootings*

> On January 19, 2008, Sergio Ventura, Salvador Gutierrez Martinez, and Alberto Ivan Narvaez–Torres, were working the late nightshift at the Coelho Farms dairy in Chowchilla. It was Narvaez–Torres's first night on the job.

> As the three men worked in the milking barn, two men rushed in and one of them initially fired two gunshots. The shooter was wearing a multicolored sweater and a yellow bandana. The shooter used a rifle with a piece of cloth tied on to catch the shell casings as they were ejected from the gun. The second assailant carried a shotgun but did not fire any shots.

---

[1] The Fifth District Court of Appeal's summary of the facts in its June 24, 2015 opinion is presumed correct. 28 U.S.C. § 2254(e)(1).

Ventura explained that Narvaez–Torres was shot and dropped to the ground. A bullet grazed Ventura in the head. Ventura initially tried to run away, saw someone else had entered the barn, and realized he could not escape. Ventura dropped to the ground and played dead. Narvaez–Torres was making noises until the shooter shot him again.

Right after Narvaez–Torres stopped making any sounds, Ventura could feel the assailants searching his pants pockets. Referring to Ventura, one of the assailants said to the other that "[t]his dude, he doesn't have anything." When Martinez, the third dairy worker, saw a gun and heard gunshots, he ran out of the barn, got a tractor, and went to Tim Coelho's home.

Coelho's home is about a quarter of a mile from the dairy barn. When Martinez and Coelho returned to the barn, they found Narvaez–Torres not breathing, with a pool of blood behind his head. A spent bullet was found in the barn. During the autopsy of Narvaez–Torres, one bullet was recovered from the victim's brain and another was recovered from his vertebrae. The bullets recovered from Narvaez–Torres were .22–caliber.

Ventura explained that Flores–Ventura was his cousin and was familiar to him. Flores–Ventura had previously worked at the dairy, but stopped doing so months prior to the shooting. Ventura saw the assailants at trial and identified Flores–Ventura. Ventura viewed a video of the shooting and testified that it accurately depicted the events that occurred that night.

According to Coelho, Flores–Ventura had worked at the dairy until August 2007. Coelho fired Flores–Ventura because he was tardy to work and failed to show up to work a couple of times.

Soon after the shooting, Flores told his friend Miguel Guillen that he had gone with Flores–Ventura to the dairy in Flores's car. They went to the dairy because someone owed Flores–Ventura money. Flores told Guillen he shot the guy who was killed with a .22–caliber rifle. When Guillen asked Flores why he did it, Flores said "he had to." Flores also told Guillen they got $10 from the victims and he later buried or burned the rifle.

3

***Flores's Conversations with Confidential Informant***

Sergeant Jason Clark of the Madera County Sheriff's Department was the lead detective in the murder investigation. Clark was introduced by a narcotics investigator to a confidential informant known as Chino on April 18, 2008. Chino agreed to use a digital recorder and subsequently met with Flores on April 18 to record their conversation. An attempt to record a conversation between Chino and Flores on April 19 failed. A second recording was made on April 21 and a third recording was made on April 24. All three recordings were transcribed.

On April 18, Flores admitted he did the "job" at the dairy. When Chino told Flores he did not believe Flores did it, Flores replied that hardly anyone knew. Flores told Chino he was angry at a guy who owed him money. Flores said to Chino that the guy he killed at the dairy, "it was not his problem." Flores referred to the gun being a sawed-off .22 rifle and that it was burned. Flores said he burned the distinctive sweater he was wearing during the shooting. The remaining clothes Flores wore that day were either burned or thrown away. Flores said he had a sock attached to the rifle with a rubber band to catch the ejected shells.

Flores–Ventura's residence was searched on April 28, 2008. In one of the bedrooms, investigators found a shotgun and shotgun ammunition on the floor next to the bed. Flores's residence was also searched on the same day. A bag of .22–caliber ammunition was found in a white pickup truck parked next to the residence. Investigators found a revolver in the glove compartment of another truck at the residence and a shotgun was found underneath the sofa cushions inside the residence.

***Custodial Interrogation of Flores–Ventura***

Flores-Ventura was taken into custody and questioned by Sergeant Clark and Detective Zachary Zamudio at the Chowchilla Police Department. Flores–Ventura was given his Miranda rights, which he waived. The interrogation was recorded, played for the jury, and also transcribed.

Flores–Ventura initially denied any involvement with the shootings at the dairy. Flores–Ventura then admitted he went to the dairy with Flores. Flores–Ventura told the investigators he had a shotgun and Flores was armed with a .22 rifle. They drove to the dairy, parked by some trees, and waited in some

bushes for five to 15 minutes, or as long as 20 minutes. Flores asked Flores–Ventura if he "'[s]hould ... take all of them out?'" Flores–Ventura said, "No dude, don't take nobody out." When they went into the barn, Flores asked Flores–Ventura whether he "'[s]hould ... do it.'" Flores–Ventura said he did not know and it was up to Flores. Flores then shot the victims. As one of the victims was whining, Flores shot him again. When Flores–Ventura saw that one of the men who had been shot was his cousin, he wanted to get out of there. Flores–Ventura said Flores turned the dead victim over and took some money. Flores–Ventura said they brought guns just to scare the victims. According to Flores–Ventura, everyone in Chowchilla knew Flores was one of the assailants because of the distinctive sweater he wore.

### Custodial Interrogation of Flores

Flores was interrogated in an interview room in the Madera County Department of Corrections Classifications Unit on April 28 by Sergeant Zamudio and Detective Clark. The audio recording of the interrogation was played for the jury at trial and a transcription is included in the record.

Clark read Flores his rights pursuant to Miranda off of a department issued card. Flores acknowledged he understood each right, waived them, and talked to the investigators. Early during questioning, Zamudio and Clark told Flores they knew he perpetrated the crime and they had proof he did it. Flores denied the allegation. Flores denied having a rifle and said he only had a shotgun. The investigators told Flores he was probably thinking he would have a short stay in jail and get out, but they assured Flores this would not happen. The investigators told Flores they knew he went to the dairy with another person, they knew the car he drove, and they knew exactly what had happened. Further, the investigators asserted Flores knew where the rifle was located, that he had not gotten rid of it and they needed to get it before it hurt someone else. Flores replied he did not know where the rifle was located and again claimed he only had a shotgun. When the investigators insisted to Flores everything they were telling him was true, Flores replied, "It's just bullshit." The investigators told Flores to start over and to tell the truth but Flores replied, "I'm done talking."

Flores was told that when they walked out of the interrogation room, he was going to be charged with murder, attempted murder, and conspiracy. Flores was asked if he had intended to kill anyone and to explain what had been going on in his

5

head. The investigators assured Flores they were not "bullshitt[ing]" him. When Flores was told the investigators had already talked to his partner and they were now going to explain to him how the crime occurred, Flores said he did not want to hear about it.

The investigators asked Flores whether it was hard for him to sleep at night or if he was just a cold-blooded killer. They told Flores they were not going to go away. The investigators told Flores they had found someone who had seen the rifle. They told Flores they found live .22 rounds and had a recording of Flores talking about committing the crimes. The investigators also told Flores they had seen his car and taken fingerprints from it.

The investigators asked Flores if he had gone to the dairy to kill three people. They told Flores the story was one-sided but he could answer their questions. Flores replied, "I just want to go back to my cell." When the officers asked if this was what he wanted, Flores replied, "Yeah." The investigators told Flores he would go back to his cell shortly and then asked him if he was tired of hearing the truth. The investigators suggested the image of the murder victim must be tearing Flores up, asked him how he felt when he saw the victim's "life go out," and to consider what his mother would want him to do.

The questioning continued for another two hours. The investigators suggested they would have to tell Flores's mother that he was a cold-blooded murderer. Flores denied that he was. When Flores was again asked how much of a cold-blooded murderer he was, he replied, "It just happened."

As the investigators confronted Flores with the details of the crimes, he said he wanted to go home. When the investigators suggested he would feel a lot better after talking to them, Flores replied, "Yeah, but then [it's] gonna look bad on me. [¶] ... [¶] I don't want to do time."

Flores continued to insist he did not know where the rifle was located. When Flores was asked if someone was supposed to be killed at the dairy, he replied, "No." Flores then said that it was Flores–Ventura's idea to drive out to the dairy that night to get money from someone who worked there. Flores did not know how much money was owed to Flores–Ventura or whether the guy was at the dairy. Flores said the crimes "just happened" and they did not want to get "caught up or something." Flores would not blame Flores–Ventura and said

the events were no one's fault. Flores said they did not know where the other dairy worker went and they panicked.

The investigators asked Flores if he needed a break or something to drink. Flores replied, "No. I wanna just go relax." Flores told the investigators he knew they were going to hold him, and he was told his bail would be high. Flores said he was hungry and wanted to go. When asked if he was sure, he said "[y]eah," but then asserted he was not a criminal and continued answering questions.

Flores told the investigators the person he and Flores–Ventura had been looking for was not at the dairy, they got scared and "freaked out," and he killed the victim by accident. Flores admitted he shot both men that night. Flores admitted that when the victim was yelling, Flores shot him in the head. Flores admitted that he "did the sweater." Flores later said he wanted to go, but then continued to insist he did not know where the rifle was located.

Flores was asked if he wanted to continue talking. He replied twice that he was "cool," wanted to eat, and was cold. Investigators offered to bring Flores food and a blanket or a sweater. Flores immediately received a sweater.

Flores said he and Flores–Ventura waited across the street 15 or 30 minutes to see who was coming and going before they walked to the barn. Flores had the rifle and Flores–Ventura carried the shotgun. Flores shot both victims. They threw their clothes in a dumpster. Flores said he did not intend to shoot anyone, he only wanted to scare them. The investigators asked Flores if he wanted water. He replied he just wanted to relax. Flores then explained the rifle was destroyed, cut into pieces and thrown into different spots, and a child would not find it.

### Hearing on Flores's Motion to Exclude His Confession

The court conducted a hearing pursuant to Evidence Code section 402 on Flores's motion to exclude his confession for violating Miranda. Outside the presence of the jury, Sergeant Zamudio listened to the recording of Flores's interrogation while following a written transcript of the recording. Zamudio stated the transcript accurately depicted the interrogation. The examination room was about 12 feet by 10 feet and had a table. Flores was not handcuffed during questioning.

During questioning, Flores said he wanted to go back to his cell and later mentioned wanting to go home. Zamudio believed Flores did not want to end questioning altogether, but felt the questions were hitting close to home and Flores did not want to respond to them. When Flores said he wanted to go home, Zamudio told him that was not an option and continued talking to him.

Zamudio understood that when a defendant states he or she wants to remain silent, his questioning of the defendant has to end. Flores, however, did not say he wanted to remain silent. Zamudio would have stopped questioning had Flores said he wanted to remain silent. After a long period of silence, Flores had said he wanted to go back to the cell.

Zamudio viewed Flores's comment about being "done talking" as a similar attempt to avoid the particular questions he was being asked. Sergeant Clark also testified he did not believe Flores's statements were an invocation of his right to remain silent based on his demeanor and the circumstances surrounding the statement. Zamudio and Clark both observed that during most of the questioning, Flores looked down at the ground. Flores was not falling asleep. Clark described Flores as looking defeated and overwhelmed during the interrogation.

The prosecutor argued that Flores had received and waived his Miranda rights and failed to make a clear, unequivocal invocation of the right to remain silent. Flores's counsel argued that his client's request to go back to his jail cell was the functional equivalent of asserting his right to remain silent. The trial court found Flores failed to make an unequivocal and unambiguous invocation of his right to remain silent. The court noted questioning continued and Flores continued to answer questions rather than refusing to do so or asking for questioning to stop. The court found Flores's statements to be voluntary and denied his motion to exclude them.

People v. Flores, No. F067554, 2015 WL 3902037, at *2–5 (Cal. Ct. App. June 24, 2015).

## III.    Jurisdiction and Venue

Relief by way of a writ of habeas corpus extends to a prisoner under a judgment of a state court if the custody violates the Constitution, laws, or treaties of the United

8

States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 n.7 (2000). Petitioner asserts that he suffered a violation of his constitutional rights. Petitioner was convicted and sentenced in this district. 28 U.S.C. § 2241(d); 2254(a). The Court concludes that it has jurisdiction over the action and that venue is proper.

## IV.   Applicable Law

The petition was filed after April 24, 1996 and is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Lindh v. Murphy, 521 U.S. 320, 326 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997). Under AEDPA, federal habeas corpus relief is available for any claim decided on the merits in state court proceedings if the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

### A.   Standard of Review

A state court decision is "contrary to" federal law if it "applies a rule that contradicts governing law set forth in [Supreme Court] cases" or "confronts a set of facts that are materially indistinguishable from" a Supreme Court case, yet reaches a different result." Brown v. Payton, 544 U.S. 133, 141 (2005) (citing Williams, 529 U.S. at 405-06). "AEDPA does not require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied. . . . The statue recognizes . . . that even a general standard may be applied in an unreasonable manner" Panetti v. Quarterman, 551 U.S. 930, 953 (2007) (citations and quotation marks omitted). The "clearly established Federal law" requirement "does not demand more than a 'principle' or 'general standard.'" Musladin v. Lamarque, 555 F.3d 830, 839 (2009). For a state decision to be an unreasonable application of clearly established federal law under

9

§ 2254(d)(1), the Supreme Court's prior decisions must provide a governing legal principle (or principles) to the issue before the state court. Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003).

A state court decision will involve an "unreasonable application of" federal law only if it is "objectively unreasonable." Id. at 75-76 (quoting Williams, 529 U.S. at 409-10); Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002). "[A]n unreasonable application of federal law is different from an incorrect application of federal law." Harrington v. Richter 562 U.S. 86, 101 (2011) (citing Williams, 529 U.S. at 410) (emphasis in original). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Id. (citing Yarborough v. Alvarado, 541 U.S. 653, 664 (2004)). Further, "[t]he more general the rule, the more leeway courts have in reading outcomes in case-by-case determinations." Id.; Renico v. Lett, 130 S. Ct. 1855, 1864 (2010). "It is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by [the Supreme Court]." Knowles v. Mirzayance, 556 U.S. 111, 122 (2009).

## B. Requirement of Prejudicial Error

In general, habeas relief may only be granted if the constitutional error complained of was prejudicial. That is, it must have had "a substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 121-22 (2007) (holding that the Brecht standard applies whether or not the state court recognized the error and reviewed it for harmlessness). Some constitutional errors, however, do not require a showing of prejudice. See Arizona v. Fulminante, 499 U.S. 279, 310 (1991); United States v. Cronic, 466 U.S. 648, 659 (1984). Furthermore, claims alleging ineffective assistance of counsel are analyzed under the Strickland prejudice standard; courts do not engage in a separate analysis applying the Brecht standard. Strickland v. Washington, 466 U.S. 668

1   (1984); <u>Avila v. Galaza</u>, 297 F.3d 911, 918, n.7 (2002); <u>Musalin v. Lamarque</u>, 555 F.3d
2   830, 834 (9th Cir. 2009).

3         **C.     Deference to State Court Decisions**

4        "[S]tate courts are the principal forum for asserting constitutional challenges to
5   state convictions," not merely a "preliminary step for a later federal habeas proceeding."
6   <u>Richter</u>, 562 U.S. at 103. Whether the state court decision is reasoned and explained, or
7   merely a summary denial, the approach to evaluating unreasonableness under
8   § 2254(d) is the same: "Under § 2254(d), a habeas court must determine what
9   arguments or theories supported or . . . could have supported, the state court's decision;
10  then it must ask whether it is possible fairminded jurists could disagree that those
11  arguments or theories are inconsistent with the holding in a prior decision of [the
12  Supreme Court]." <u>Id.</u> at 102. In other words:

13         As a condition for obtaining habeas corpus relief from a
14         federal court, a state prisoner must show that the state
           court's ruling on the claim being presented in federal court
15         was so lacking in justification that there was an error well
           understood and comprehended in existing law beyond any
16         possibility for fairminded disagreement.

17  <u>Id.</u> at 103. Thus, the Court may issue the writ only "in cases where there is no possibility
18  fairminded jurists could disagree that the state court's decision conflicts with [the
19  Supreme Court's] precedents." <u>Id.</u> at 102.

20       "Where there has been one reasoned state judgment rejecting a federal claim,
21  later unexplained orders upholding that judgment or rejecting the claim rest on the same
22  grounds." <u>See</u> <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 803 (1991). Thus, the court will "look
23  through" a summary denial to the last reasoned decision of the state court. <u>Id.</u> at 804;
24  <u>Plascencia v. Alameida</u>, 467 F.3d 1190, 1198 (9th Cir. 2006). Furthermore, the district
25  court may review a habeas claim, even where the state court's reasoning is entirely
26  unexplained. <u>Richter</u>, 562 U.S. at 98. "Where a state court's decision is unaccompanied
27  by an explanation, the habeas petitioner's burden still must be met by showing there was

28

no reasonable basis for the state court to deny relief." <u>Id.</u> ("This Court now holds and reconfirms that § 2254(d) does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'").

## V.    Review of Petition

Petitioner argues that he invoked his Fifth Amendment right to remain silent when he stated, during interrogation, "I'm done talking," and "I just want to go back to my cell." (ECF No. 1 at 19.) Accordingly, Petitioner argues, the detectives violated <u>Miranda</u> by continuing to question Petitioner, and his confession therefore should not have been admitted.

Respondent argues that the state court could reasonably determine that Petitioner's statements were not unambiguous and unequivocal invocations of Petitioner's right to remain silent, and thus the state court's rejection of this claim was not contrary to or an unreasonable application of clearly established United States Supreme Court precedent.

### A.    State Court Decision

The last reasoned decision of the state court summarily denied Petitioner's <u>Miranda</u> claim. The Court of Appeal rejected the claim as follows:

> Flores contends he made an unequivocal and unambiguous assertion of his right to silence when he asked to go back to his jail cell. Flores argues the investigating officers violated his Miranda rights and the trial court erred in failing to exclude the statements he made during his interrogation after making that request. Flores–Ventura, who filed his opening brief prior to Flores, joined in Flores's arguments pursuant to California Rules of Court, rule 8.200(a)(5).
>
> After the adoption in 1982 of former article I, section 28, subdivision (d) of the California Constitution, California's appellate courts must apply federal standards to <u>Miranda</u> issues. The reviewing court must accept the trial court's resolution of disputed facts and the inferences that can be drawn from those facts, as well as the trial court's evaluations of credibility, if supported by substantial evidence. The reviewing court "'independently determine[s] from the undisputed facts and the facts properly found by the trial

court whether the challenged statement was illegally obtained.'" (<u>People v. Gonzalez</u> (2005) 34 Cal.4th 1111, 1125.)

A suspect may not be subjected to custodial interrogation unless he or she knowingly and intelligently has waived the rights to remain silent and the presence of counsel, and the right to appointed counsel if indigent. (<u>People v. Dykes</u> (2009) 46 Cal.4th 731, 751.) After being advised of his or her rights, a suspect can validly waive them and respond to questioning. (<u>Edwards v. Arizona</u> (1981) 451 U.S. 477, 484.)

If the suspect indicates at any time prior to or during questioning that he or she wishes to remain silent or wants an attorney, the interrogation must cease until an attorney is present. (<u>Miranda</u>, supra, 384 U.S. at pp. 473–474.) "'The prosecution bears the burden of demonstrating the validity of the defendant's waiver [of <u>Miranda</u> rights] by a preponderance of the evidence.'" (<u>People v. Williams</u> (2010) 49 Cal.4th 405, 425; <u>see</u> <u>People v. Dykes</u>, supra, 46 Cal.4th at p. 751.)

Where, as here, the defendant initially waives <u>Miranda</u> rights and then requests counsel or seeks to end the interrogation, the United States Supreme Court has set forth the standard for courts to determine whether questioning should cease in <u>Davis v. United States</u> (1994) 512 U.S. 452 (<u>Davis</u>). The defendant in <u>Davis</u> was being interrogated by agents of the Naval Investigative Service after being advised of and waiving his <u>Miranda</u> rights. About an hour and a half into questioning, the defendant said that maybe he should talk to a lawyer. The agents asked him if he wanted a lawyer and reminded the defendant of his right to remain silent. The defendant said he thought he wanted a lawyer before he said anything else. (<u>Davis</u>, supra, at p. 455.)

In <u>Davis</u>, the Supreme Court found that whether the suspect has invoked his or her right to counsel is an objective inquiry. If the suspect, however, makes a reference to an attorney that is ambiguous or equivocal so that a reasonable officer in light of the circumstances would have understood that the suspect might be invoking the right to counsel, investigators do not have to cease questioning. It is incumbent upon the suspect to unambiguously request counsel. (<u>Davis</u>, supra, 512 U.S. at pp. 459–460.) The Supreme Court noted that once the suspect has received <u>Miranda</u> warnings and there is a knowing and voluntary waiver of them, this is sufficient to

dispel any coercion in the interrogation process. (<u>Davis</u>, supra, 512 U.S. at p. 461.)

Applying the standard for postwaiver invocation of Miranda rights set forth in <u>Davis</u>, the California Supreme Court evaluated the claim of a juvenile who had been given complete Miranda warnings and implicitly waived his rights by answering questions by investigators. (<u>People v. Nelson</u> (2012) 53 Cal.4th 367, 375–380 (<u>Nelson</u>).) The juvenile sought to suppress statements he made after later telling investigators he wanted to let his mother know where he was and what was happening to him. The juvenile made a request for counsel, but limited it to counsel's presence during a polygraph test. Toward the end of questioning, the juvenile stated several times he wanted to see his mother, he wanted time to be alone until his family arrived, and he wanted time to think about things before writing a statement concerning what happened. (<u>Id.</u> at pp. 382–383.)

The court in <u>Nelson</u> found that under these circumstances, the juvenile "did not convey an unambiguous request to halt all questioning, or a clear unwillingness to continue . . . without a lawyer." (<u>Nelson</u>, supra, 53 Cal.4th at p. 382.) <u>Nelson</u> further found that the invocation for counsel was conditional to the application of a polygraph test. (<u>Ibid.</u>) It held the juvenile defendant had failed to make an unambiguous and unequivocal invocation of his <u>Miranda</u> rights and "[a] reasonable officer in the circumstances would not have understood defendant's requests to call his mother, or any of his other statements, to be unambiguous and unequivocal invocations of his <u>Miranda</u> rights." (<u>Id.</u> at p. 383.) The court concluded the investigators were not required to cease questioning, and the defendant's custodial statements were admissible at trial. (<u>Id.</u> at pp. 383–384.)

Flores does not challenge the initial advisement of <u>Miranda</u> rights, or his waiver of them, prior to questioning by investigators. As did the defendants in <u>Davis</u> and <u>Nelson</u>, Flores asserts there was a violation of his <u>Miranda</u> rights after he waived them and participated in questioning by the investigators. Early during the interrogation, Flores said he was done talking and shortly thereafter asked to be taken back to his jail cell. Much later during questioning, Flores said he wanted to go home. On each of these occasions, however, Flores continued to engage in conversation with investigators, continued to deny he was a cold-blooded killer, and failed to clearly state either that he wanted an attorney or he wanted to stop questioning. When investigators asked

14

Flores late into the interrogation whether he wanted to stop, he replied he was "cool."

Under the circumstances of this case, Flores failed to make an unequivocal and unambiguous assertion that he wanted counsel or that he wanted to stop talking to the investigators. Two cases—one from the California Supreme Court and the other from the Ninth Circuit Court of Appeals—involve nearly identical facts to this case. In both cases the defendant asked to be taken back to his cell, and it was held the statement was not an unequivocal and unambiguous request to end questioning. (People v. Rundle (2008) 43 Cal.4th 76, 114–116 (Rundle), disapproved on another ground in People v. Doolin (2009) 45 Cal.4th 390, 421, fn. 22; DeWeaver v. Runnels (9th Cir. 2009) 556 F.3d 995, 1001–1002 (DeWeaver).)

Flores attempts to distinguish DeWeaver by arguing the investigators here did not know Flores knew how to invoke his right to silence. In light of the testimony from both Clark and Zamudio that they did not perceive Flores's comments as an invocation of his Miranda rights, and giving due deference to the factual findings of the trial court, we find Flores's attempt to distinguish DeWeaver to be unpersuasive.

This case is also directly analogous to People v. Stitely (2005) 35 Cal.4th 514, 535 (Stitely), where the defendant said he thought it was about time to stop talking. The California Supreme Court held that a reasonable officer would not find such a statement to be an unequivocal and unambiguous request to terminate the interrogation. (Id. at p. 536.) We find Davis, Nelson, Stitely, Rundle, and DeWeaver to be both persuasive and controlling authority. Flores's statements seeking to go back to his jail cell and that he should stop talking were not unequivocal and unambiguous attempts to invoke his Miranda rights and to end further interrogation. The trial court did not err in denying Flores's motion to suppress his statements to investigators.

Flores, 2015 WL 3902037, at *6–7.

## B.    Applicable Law

In Miranda v. Arizona, 384 U.S. 436, 444 (1966), the United States Supreme Court held that "[t]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it

demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." Thus, "suspects interrogated while in police custody must be told that they have a right to remain silent, that anything they say may be used against them in court, and that they are entitled to the presence of an attorney, either retained or appointed, at the interrogation." Thompson v. Keohane, 516 U.S. 99, 107 (1995); Miranda, 384 U.S. at 473-74. Once Miranda warnings have been given, "all questioning must cease" if a suspect makes a clear and unambiguous statement invoking his constitutional rights. Smith v. Illinois, 469 U.S. 91, 98 (1984).

The waiver of Miranda rights may be express or implied. See North Carolina v. Butler, 441 U.S. 369, 373-75 (1979). However, the invocation of the right to remain silent and the right to counsel may not be ambiguous or equivocal. Berghuis v. Thompkins, 560 U.S. 370, 381-82 (2010). A suspect's "simple, unambiguous" statement that he "wanted to remain silent or that he did not want to talk with the police" is sufficient to invoke his "right to cut off questioning." Id. at 382 (citation omitted).

### C.    Analysis

#### 1.    Violation of Clearly Established Law

Here, there is no dispute that Petitioner knowingly, voluntarily, and intelligently waived his Miranda rights at the outset of the interrogation. Thereafter, the officers questioned Petitioner at some length regarding the shooting, and Petitioner denied having any special knowledge of the incident.

Eventually, the following exchange occurred:

> Q1:    Tell the truth, tell the truth.
>
> A:    Tell the truth about what?
>
> Q1:    The dairy.
>
> A:    Well . . . I heard about the dairy.
>
> Q1:    Let's start there. Again, just try it again. Try again. Just try again.

16

| | |
|---|---|
| Q1: | Who were you there with? |
| A: | I'm done talking. |
| Q: | Y-You think we're bullshitting you? |
| Q1: | Denying it, denying it. |
| Q1: | Here's your chance. |
| Q: | Jesus? Look at me please. You think I'm bullshitting you about this? |

(Lodged Doc. 8 at 15-16.)

Petitioner continued to deny any special knowledge of or involvement in the incident. After detailed further questioning, the following exchange occurred:

| | |
|---|---|
| Q: | . . . You just gonna show us no respect, even though we go out of our way to show you respect? You can answer us something. |
| A: | I just want to go back to my cell. |
| Q: | You want to go back to your cell? |
| A: | Yeah. |
| Q. | Okay. You will very shortly. . . . |

(Lodged Doc. 8 at 21.)

However, Petitioner did not go back to his cell. The officers continued to question him, and Petitioner continued to deny involvement in the shooting. Eventually, the officers began speaking to each other regarding arresting Petitioner for murder. (Lodged Doc. 8 at 23.) They asked Petitioner what color the victim's eyes were and to describe the sound the victim's screams made. They told Petitioner they didn't want to go to his mother and tell her he was a cold blooded murderer. Eventually, an officer asked, "But how responsible are you? How cold blooded of a killer are you?" (Lodged Doc. 8 at 25.) Plaintiff responded, "It just happened." (Id.) After further questioning, Plaintiff provided additional details regarding the shooting.

17

The Court begins with the first statement Plaintiff claims invoked his right to silence. After having validly waived his Miranda rights, Petitioner stated to the officers, "I'm done talking." Courts having considered the issue have concluded that such a statement represents a clear, unambiguous, and unequivocal invocation of the right to remain silent. Jones v. Harrington, 829 F.3d 1128, 1141 (9th Cir. 2016) (holding that statement "I don't want to talk no more" was unambiguous invocation of right to remain silent.); United States v. Heine, No. 3:15-CR-238-SI-1, 2016 WL 6808595, at *23 (D. Or. Nov. 17, 2016) (holding that statement, "I really don't want to talk anymore" was unambiguous invocation of right to remain silent). The statement was not qualified by any hallmarks of equivocation, such as "maybe" or "might" or "I think." Jones, 829 F.3d at 1140; Arnold v. Runnels, 421 F.3d 859, 865 (9th Cir. 2005) (words such as "maybe" or "might" can render statements ambiguous); see also Davis v. United States, 512 U.S. 452, 462 (1994) (holding that phrase, "maybe I should talk to a lawyer" was ambiguous); Clark v. Murphy, 331 F.3d at 1062, 1072 (9th Cir. 2003) (holding that phrase, "I think I would like to talk to a lawyer" was ambiguous).

Additionally, Petitioner did not state, "I'm done talking now" or "I'm done talking to you," statements which might have cast doubt on whether Plaintiff truly wished to remain entirely silent. Nor did Petitioner follow this statement with questions or other indications that he desired to talk further. None of the circumstances of the interrogation cast doubt on whether the statement "I'm done talking" reflected anything other than Petitioner's desire to remain silent. Indeed, the Court is unable to come up with any reasonable interpretation of the phrase "I'm done talking" that does not express a desire to remain silent.

Respondent presents two grounds for concluding the statement was ambiguous. First, Respondent argues that "a reasonable officer could have concluded that this remark was simply a comment that there was no more he wanted to say at that time or about a certain subject," and that the statement was merely an expression of frustration.

Again, however, the statement itself contains no such equivocation. Second, Respondent points out that Petitioner continued to converse after having stated, "I'm done talking." This second point, however, is irrelevant. It is well-settled, and was well-settled at the time of the events at issue here, that the Court may not look "to post-invocation statements to 'cast retrospective doubt on the clarity of [Petitioner's] initial request itself.'" Jones, 829 F.3d at 1140 (quoting Smith v. Illinois, 469 U.S. 91, 98–99 (1984)).

Based on the foregoing, the Court concludes that the statement, "I'm done talking" was an unequivocal and unambiguous invocation of Petitioner's right to remain silent.[2] The California Court of Appeal's conclusion that this statement was ambiguous is contrary to and an unreasonable application of Miranda. 28 U.S.C. § 2254(d)(1); Miranda, 384 U.S. at 473–74, 86 S.Ct. 1602 (holding that the right to remain silent can be invoked "any time prior to or during questioning").

## 2.   Harmlessness

The "actual prejudice" standard set out in Brecht v. Abrahamson, 507 U.S. 619 (1993), applies to the Court's Miranda error. Under Brecht, the constitutional error complained of must have had "a substantial and injurious effect or influence in determining the jury's verdict." Id. at 623; see also Fry v. Pliler, 551 U.S. 112, 121-22 (2007) (holding that the Brecht standard applies whether or not the state court recognized the error and reviewed it for harmlessness). "This standard is satisfied if the record raises 'grave doubts' about whether the error influenced the jury's decision." Jones, 829 F.3d at 1141 (quoting Davis v. Ayala, 135 S. Ct. 2187, 2203 (2015)).

In many cases, the prejudice caused by the failure to suppress statements taken in violation of Miranda will be insurmountable. "A confession is like no other evidence.

---

[2] Thus, all questioning should have ceased at this point in the interrogation, and the Court therefore need not consider whether the later statement, "I just want to go back to my cell," also constituted a separate invocation of the right to remain silent. The Court notes, however, that similar statements have been held insufficient to clearly and unambiguously invoke constitutional rights. See Welch v. Harrington, No. CV 09-01041-JVS JEM, 2010 WL 4794237, at *4 (C.D. Cal. Oct. 18, 2010), report and recommendation adopted, 2010 WL 4794236 (C.D. Cal. Nov. 17, 2010).

Indeed, 'the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him.'" <u>Arizona v. Fulminante</u>, 499 U.S. 279, 296 (1991). Because a confession may have a "profound impact" on the jury, the Court must "exercise extreme caution before determining that the admission of the confession at trial was harmless." <u>Id.</u>

The Ninth Circuit has recognized that erroneously admitted evidence is likely to be found prejudicial when the prosecutor emphasizes the importance of that evidence during closing arguments. <u>See Garcia v. Long</u>, 808 F.3d 771, 782–84 (9th Cir. 2015) (admission of audiotape of petitioner's three and half hour interrogation and letter written during interrogation was not harmless despite other evidence implicating him in charged crime, in part, because the petitioner's statements "were the focal point of the prosecution's closing argument"); Jones, 829 F.3d at 1142 (admission of petitioner's confession obtained in violation of his right to remain silent was not harmless, in part, because prosecutor, in closing arguments, repeatedly referred to petitioner's statements and told jury that it "could convict beyond a reasonable doubt based only on [petitioner's] own statements").

Here, the defense conceded that Petitioner had committed the murder, but disputed the degree of murder. In this regard, the prosecution relied in closing on statements taken in violation of <u>Miranda</u> to show that the murder was premeditated, that it was committed by lying in wait, and that it occurred during the conduct of a robbery. However, even setting aside the statements taken in violation of <u>Miranda</u>, the evidence against Petitioner was substantial. The shooting itself was video recorded. The video is described as portraying Petitioner rushing into the dairy, with his face covered, and immediately starting to shoot. The video was described as showing that the firearm had a "catcher" to catch the spent casings. The prosecution relied on this evidence to support the premeditation and lying-in-wait theories. This evidence is not "weak tea" compared with Petitioner's own words admitting the crime. <u>See Jones</u>, 829 F.3d at 1142

1  (describing the defendant's "confusing comments about his whereabouts" at the time of

2  the crime as "weak tea" compared with defendant's confession). Although the evidence

3  regarding the lying-in-wait special circumstance, in particular, is rendered somewhat

4  weaker by the absence of Petitioner's confession, the Court nonetheless cannot say that

5  it has "grave doubts" that the jury would have reached the same verdict absent this

6  evidence.

7      Furthermore, this was not the only evidence presented against Petitioner, nor was

8  it the only evidence focused on by the prosecution. Petitioner also confessed to his

9  friend Miguel that he went to the dairy to collect money, that he had carried out the

10 shooting, and that he did it because he "had to." Miguel testified against Petitioner at

11 trial. Petitioner also confessed to his friend Chino that "he did the job" at the dairy and

12 that he did it because a "guy owed me money," but that guy wasn't there. Instead, the

13 "guy that I killed, it was not his problem. It was not his problem." (Lodged Doc. 7 at 70,

14 73, 82-83.) These statements were recorded and played for the jury in Spanish. The jury

15 was presented with an English-language transcript of the discussion. While the

16 prosecutor did rely in closing on Petitioner's statements to officers, the prosecutor

17 identified the conversation with Chino as the "one conversation that really is key."

18 (Lodged Doc. 20 at 3422.) Indeed, the prosecutor cited largely to the recorded

19 conversations with Chino as proof of the elements of the crime.

20      Although the Court clearly recognizes the profound impact a confession may have

21 on the jury, in the circumstances of this case, the confession was not necessarily the

22 most persuasive evidence. Based on the foregoing analysis, the Court concludes that

23 admission of the confession was harmless. Petitioner is not entitled to relief.

24 **VI.    Conclusion and Recommendation**

25      Based on the foregoing, it is HEREBY RECOMMENDED that the petition for writ

26 of habeas corpus be DENIED.

27

28

The findings and recommendation are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1). Within **thirty** (30) days after being served with the findings and recommendation, any party may file written objections with the Court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Any reply to the objections shall be served and filed within fourteen (14) days after service of the objections. The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal. Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated: __April 16, 2018__          ___/s/ Michael J. Seng___
                                   UNITED STATES MAGISTRATE JUDGE